IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GLOBAL INTEGRATED BUILDING          §
SYSTEMS,                            §
                                    §
        Plaintiff,                  §
                                    §
v.                                  §        CIVIL ACTION NO. H-06-2637
                                    §
TARGET LOGISTICS, LLC, JOSEPH       §
H. MURPHY, individually,            §
                                    §
        Defendants.                 §


<u>MEMORANDUM AND ORDER</u>

Pending are Joseph H. Murphy and Target Logistics, LLC's Motion for Summary Judgment (Document No. 87), Brian S. Lash and Target Logistics, LLC's Motion for Summary Judgment (Document No. 86), Peter Baricev and The Administrators of the Tulane Educational Fund's Motion for Partial Summary Judgment (Document No. 82), Target Logistics, LLC's Motion for Summary Judgment on Plaintiff Global Integrated Building Systems' Breach of Contract Damages Claim (Document No. 88), Global Integrated Building Systems' Motion for Partial Summary Judgment (Document No. 91), and Target Logistics, LLC's Motion for Summary Judgment on The Administrators of the Tulane Educational Fund's Breach of Faculty Agreement Claim (Document No. 90).  After having considered the motions, response, replies, and the applicable law, the Court concludes as follows.

I.  <u>Background</u>

As a result of the devastation that affected the Gulf Coast following Hurricane Katrina on August 29, 2005, Tulane University,[1] located in New Orleans, Louisiana, cancelled its fall 2005 semester.  In an effort to ensure it had sufficient housing for its students and faculty when it resumed classes in the spring, Tulane entered into two contracts with Target Logistics, LLC ("Target"), for Target to deliver housing modules to Tulane.  The Tulane-Target Student Housing Agreement obligated Target to deliver forty-four student housing modules on or before January 11, 2006.[2]  The Tulane-Target Faculty Housing Agreement required Target to deliver twenty-one faculty housing modules by January 2, eleven by January 8, and twelve by January 15--a total of forty-four faculty housing modules.[3]  Both Agreements also had provisions for "Liquidated Damages and Provision of Hotel Rooms and Shuttle Service," which required Target to provide hotel rooms and shuttles to the displaced students and faculty members if Target did not timely deliver all student and faculty units by January 11th and

---

[1]  The Administrators of the Tulane Educational Fund refer to themselves simply as "Tulane," as do the other parties.  *See* Document No. 82 at 3-4.  So too will the Court herein.

[2]  *See* Document No. 7, ex. 1 (Tulane-Target Student Housing Agreement).

[3]  <u>Id.</u>, ex. 2 (Tulane-Target Faculty Housing Agreement).

2nd, respectively.[4]    Pursuant to the Agreements, Tulane was obligated to pay Target $77,900 per student housing module, and $92,507 per faculty housing module delivered to the agreed-upon site "and approved by Tulane's Consulting Architect as being in conformity with th[ese] Agreement[s] and the attachments thereto," for total contract prices of $3,427,600 and $4,070,308, respectively.[5]

In order to perform its agreement with Tulane, Target contemporaneously contracted with Global Integrated Building Systems ("GIBS") to manufacture the forty-four student and forty-four faculty housing modules.[6]    Pursuant to the GIBS-Target Housing Agreements, Target was to pay GIBS $2,064,0546 for the forty-four student housing modules, and $2,582,206 for the forty-four faculty housing modules.[7]    The GIBS-Target Housing Agreements required Target to pay GIBS on a per-unit-shipped basis within ten days of biweekly invoicing.[8]

In early January 2006, soon after performance began on these contracts, the parties started experiencing difficulties.    The

---

[4] Id., exs. 1 & 2 at 8.

[5] Id., exs. 1 & 2 at 4-5.

[6] Document No. 24, exs. A & B (GIBS-Target Student Housing Agreement and GIBS-Target Faculty Housing Agreement, respectively).

[7] Id., exs. A & B at 19.

[8] Id., exs. A & B at 17.

3

student housing modules received by Tulane allegedly were delivered late and riddled with flaws and design defects.  So, in early January, after the first ten student modules were shipped to Tulane, Tulane ordered Target to cease production on all remaining housing modules.[9]  Target in turn advised GIBS to cease production.

<u>Student Housing Modules</u>

In an effort to address the manufacturing issues, at least two representatives from each of GIBS, Target, and Tulane met at GIBS's facility in Houston, Texas, on January 15th and 16th, 2006.[10]  Soon after the Houston meeting, production resumed on the student housing modules.[11]  Thereafter, Target and Tulane executed Addendum A to the Tulane-Target Student Housing Agreement.[12]

When Addendum A was executed--on February 10th by Brian S. Lash ("Lash"), Target's CEO, and on February 14th by Anthony Lorino, Tulane's Senior Vice President for Operations and CFO--only twenty-two student housing modules had been delivered to Tulane.[13]  Tulane, however, had not accepted any of the modules allegedly

---

[9] Document No. 82, ex. 1 (Baricev Depo.) at 77.

[10] Document No. 87, ex. 11 (Winfried Depo.) at 219-38.

[11] <u>Id.</u>, ex. 5 (email) at TRG 00705.

[12] Document No. 86, ex. 5 (Baricev Depo.) at 93-99; Document No. 87 at 9-12.

[13] <u>Id.</u>, ex. 7 (Addendum) at 1.

because they were non-conforming, and thus had not paid Target under the terms of the Tulane-Target Student Housing Agreement.[14] According to Addendum A, "Tulane, solely in the spirit of cooperation," agreed to make payments to Target so that Target could, in turn, make progress payments to GIBS.[15] Specifically, Tulane agreed to release $599,830 to Target upon receipt of an invoice for same, and $50,635 per student housing module (65% of the original contract price of $77,900 per student housing module) thereafter delivered by Target so long as the future modules were in a condition comparable to the twenty-two already delivered.[16] In addition, Addendum A provided that Tulane would pay Target $589,114 when all forty-four student housing modules were delivered, final drawings for the modules provided, and the modules were approved by Tulane's consulting architect.[17]

On February 15, 2006, Target's CEO, Lash, and its president and general counsel, Joseph H. Murphy ("Murphy"), met with GIBS's attorney, Stephen Smith ("Smith"), in New Orleans to discuss, according to GIBS, "Target's failure to make payments in accordance

---

[14] Id. at 1-2; Document No. 7, ex. 1 (Tulane-Target Student Housing Agreement).

[15] Document No. 86, ex. 7 (Addendum) at 1.

[16] Id., ex. 7 (Addendum) at 1.

[17] Id., ex. 7 (Addendum) at 1.

with the [GIBS-Target Housing Agreements]."[18]  One result of the February 15, 2006 meeting was the so-called "Smith-Target Payment Arrangement."[19]  This Arrangement, agreed to by Murphy by email on February 17 with eighteen student modules still undelivered, required Target to pay GIBS $224,943.77 per four student housing modules delivered henceforth, or $56,235.94 each.[20]  The terms of the Arrangement were followed for the next eight delivered modules. Then, on February 23, 2006, an officer with GIBS agreed to load four more student housing modules for delivery, and Murphy agreed to keep the terms of the Arrangement, and thus GIBS released the four additional student housing modules to Target.[21]  Target, however, admittedly never paid for these four student housing modules.[22]  Target alleges that Lash, not Murphy, made the decision to withhold payment because the four modules delivered were "riddled with electrical and plumbing deficiencies," and Target's funds were exhausted due to payments to other contractors, "many of

---

[18] Document No. 24 ¶ 3.8.

[19] *See* Document No. 87, ex. 13 (Murphy Decl.); ex. 4 (Smith Depo.) at 328.

[20] Id., ex. 13 (Murphy Decl.) at ex. 89 (email thread), 90 (email confirmation of Arrangement).

[21] Id.

[22] *See* Document No. 87 at 13-15.

whom were hired to correct flaws in the Student Modules caused by [GIBS's] poor craftsmanship."[23]

Thus, GIBS manufactured all forty-four of the student housing modules and delivered thirty-eight of them to Target.  In March 2006, GIBS delivered the six undelivered modules to its secured creditors, who, in turn, sold them to a third party for $35,000 each.[24]

<u>Faculty Housing Modules</u>

Sometime between January 5th and 10th, after the dates Target was required to begin delivering the first installments of faculty housing modules to Tulane, Tulane notified Target that it no longer desired the faculty housing modules and wished to negotiate a termination of the Tulane-Target Faculty Housing Agreement.[25] Target, in turn, advised GIBS to cease manufacturing on the faculty modules.[26]  Until that point, GIBS had manufactured only a few floor boxes and wall portions for the faculty housing modules, which GIBS ultimately turned over--along with all unused manufacturing

---

[23] <u>Id.</u> at 14-15.

[24] *See* Document No. 88, ex. 1 (Christian Depo.) at 16-34; ex. 8 (Clearwater Bill of Sale).  Target alleges that it should receive a credit for GIBS's sale of the six undelivered student modules. Document No. 88 at 46-49.

[25] Document No. 90, ex. 5 (Jester Depo.) at 291-315; ex. 2 (Lorino Depo.) at 116-117, 169-72; ex. 6 (Lash Depo.) at 93-95.

[26] <u>Id.</u>, ex. 6 (Lash Depo.) at 103-05, 179-80.

materials--to its secured creditors, who in turn sold the items to a third party.[27]  From January until March 2006, Target and Tulane engaged in unsuccessful settlement discussions for the buyout of the Tulane-Target Faculty Housing Agreement.[28]  On April 24, 2006, Tulane sent Target a letter stating that, because Target had not delivered any of the anticipated faculty modules, it considered the Tulane-Target Faculty Housing Agreement "dissolved."[29]

GIBS filed this suit in state court against Target and Murphy, who removed on the basis of diversity jurisdiction.[30]  In its Second Amended Complaint, GIBS asserts claims for breach of contract against Target; fraud against Target, Lash, Murphy, Baricev, and Tulane, and Tulane's employee Peter Baricev ("Baricev"); promissory estoppel against Tulane; exemplary damages against Target, Lash, Murphy, Tulane, and Baricev; attorney's fees and costs.[31]  Target asserts counterclaims against GIBS for breach of contract.[32]  Target also filed a Third-Party Complaint against Tulane alleging breach

---

[27] *See* Document No. 88, ex. 1 (Christian Depo.) at 16-34; ex. 8 (Clearwater Bill of Sale).

[28] Document No. 90, ex. 2 (Lorino Depo.) at 153-54.

[29] Id., ex. 8 (letter from David B. Epstein to Lash).

[30] Document No. 1, ex. Amend. Pet.; Document Nos. 97, 108.

[31] Document No. 24.

[32] Document No. 4.

of contract.[33]   Tulane answered Target's Third-Party Complaint and alleged a breach of contract counterclaim of its own against Target.[34]

## II.   Standards of Review

Rule 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."   FED. R. CIV. P. 56(c).   The moving party must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).   A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice.   Id.   "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."   Id.

---

[33] Document No. 7.

[34] Document No. 16.

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993) (citing Matsushita, 106 S. Ct. at 1351). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." Anderson, 106 S. Ct. at 2513.

In order to withstand a no-evidence motion for summary judgment, the nonmovant must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 106 S. Ct. at 2552. If the nonmovant fails to make such a showing, "there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders

all other facts immaterial," and summary judgment must be granted. Id.

### III.   Discussion

**A.   The Motions for Summary Judgment Against GIBS on Its Fraud Claims**

GIBS asserts fraud claims against Murphy, Lash, Target, Baricev, and Tulane,[35] all of whom move for summary judgment on the fraud claims.[36]  For the reasons that follow, the motions will be granted.

**1.   GIBS's Fraud Claim Based on Murphy's Alleged Misrepresentation**

Murphy and Target move for summary judgment dismissing GIBS's fraud claim against Murphy, and by extension Target.  GIBS alleges that Murphy made a material misrepresentation when he promised to wire money for the last four student modules delivered under the Smith-Target Payment Arrangement with no intention actually to wire the money, and further, "but for Murphy's misrepresentations, GIBS would not have agreed to deliver the final shipment of modular units."[37]  Murphy and Target contend that there is no evidence that

---

[35] Document No. 24 ¶¶ 3.7, 3.8, 3.9, 5.1, 5.2.

[36] Document Nos. 82, 86, 87.

[37] Document No. 24 ¶¶ 3.9, 5.1

Murphy acted to defraud GIBS and also that GIBS's fraud claim is barred by the law of "con-tort."[38]

To prove Murphy committed fraud, GIBS must generally show: (1) Murphy made a material representation, (2) which was false, (3) which Murphy knew was false or made recklessly without knowledge of the truth at the time it was made, (4) Murphy made the representation with the intention that GIBS rely on it, (5) GIBS actually and justifiably relied on the representation, and (6) the misrepresentation resulted in injury to GIBS.  Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001); Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 524 (Tex. 1998).  "A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act." Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 434 (Tex. 1986). "Although the failure to perform, standing alone, does not establish the issue of fraudulent intent, '[s]light circumstantial evidence of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent.'" Beijing Metals & Minerals Imp./Exp. Corp. v. Am. Bus., 993 F.2d 1178, 1186 (5th Cir. 1993) (quoting Spoljaric, 708 S.W.2d at 435).

"'[I]ntent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the

---

[38] Document No. 87 at 17-29.

witnesses and the weight to be given to their testimony.'"   Id. at
1185 (quoting Spoljaric, 708 S.W.2d at 434).  As such, "'[s]ummary
judgment is rarely proper.'"   Beijing Metals, 993 F.2d at 1186
(quoting Taylor v. Bonilla, 801 S.W.2d 553, 557 (Tex. App.--Austin
1990, writ denied)).  However, "[i]t is well established in [the
Fifth Circuit] that an allegation of fraud does not create an
impenetrable shield through which the sword of summary judgment
cannot pierce.  A fraud case can be wounded and killed like any
other case; it receives no special privileges or protections in the
battle for summary dismissal."   S.W.S. Erectors, Inc. v. Infax,
Inc., 72 F.3d 489, 495 (5th Cir. 1996) (affirming summary judgment
where the only evidence proffered by the plaintiff as to its fraud
claim was an affidavit that contradicted earlier sworn deposition
testimony).[39]

---

[39] *See also* Kansa Reins. Co. v. Cong. Mort. Corp. of Tex., 20
F.3d 1362, 1375-76 (5th Cir. 1994) (affirming summary judgment
after agreeing with the district court that the plaintiff
introduced no evidence of the defendant's knowledge or intent to
deceive); Collier v. Wells Fargo Home Mortg., No. 7:04-CV-086-K,
2006 WL 1464170, at *9-10 (N.D. Tex. May 26, 2006) (granting
summary judgment for defendant on plaintiff's fraud claim where
"[t]he summary judgment record contain[ed] no evidence of any
intent to deceive or intent not to perform according to the
contracts when they were entered into"); Corp. Link, Inc. v.
Fairbanks Cap. Corp., No. Civ.A. 3:03-CV-0506, 2005 WL 770564, at
*8-10 (N.D. Tex. Apr. 4, 2005) (granting summary judgment for the
defendant on the plaintiff's fraud claim where the only evidence of
intent not to perform "consist[ed] of claiming that [the
defendant's] legal arguments in this case demonstrate[d] that it
never intended to perform").

Here, GIBS proffers no summary judgment evidence that when Murphy represented to GIBS that Target would pay in accordance with the terms of the Smith-Target Payment Arrangement, he did so with "the intention, design and purpose of deceiving, and with no intention of performing the act." Spoljaric, 708 S.W.2d at 434. There is, however, uncontroverted summary judgment evidence that after Murphy had agreed to honor the Payment Arrangement for the next four modules, Lash instructed Murphy to withhold payment ostensibly because the modules had severe deficiencies and because Target had financial challenges associated with the overall project.[40]  GIBS strongly attacks the reasons given by Lash to Murphy, but whether the reasons Lash gave to Murphy for countermanding Murphy's agreement were well founded are irrelevant to *Murphy's* intent when he promised to make the payment.  The arguable lack of merit in the reasons that Lash gave for his directing Murphy not to pay as Murphy had promised to do in no way establishes that Murphy, or by extension Target, intended not to perform the agreement *when Murphy made the promise*.  There is no direct or circumstantial evidence from which an inference may be drawn that *Murphy* when he made the promise of future payment upon release of the next set of four modules, did so with a then present intention, design, or purpose to deceive GIBS and with no intention

---

[40] Document No. 87, ex. 13 (Murphy Decl.) ¶ 12; ex. 15 (Lash Decl.) ¶ 9.

to pay.   All of the evidence of record is to the contrary.
Accordingly, because GIBS has failed to present any evidence to
raise so much as a fact issue on its fraud claim, Murphy and Target
are entitled to summary judgment dismissing the claim.[41]

>        2.   <u>GIBS's Fraud Claims Based on Lash's Alleged Misrepre-
>             sentation and Nondisclosure</u>

Lash and Target move for summary judgment dismissing GIBS's
fraud claims against Lash, and by extension Target.   GIBS alleges
that Lash committed fraud by misrepresentation and by nondisclosure
when he told GIBS that Target "was negotiating with Tulane to
obtain funds which would be given to GIBS as payment under the
Housing Agreements" but did not disclose the existence or contents
of Addendum A to the Tulane-Target Student Housing Agreement, which
recited that "Tulane has not accepted any of the [student housing]
Modules in their current condition, all of which are non-
conforming."[42]   According to GIBS, "[i]f Lash had disclosed th[is]
term[] of Addendum A, which essentially places Target in default of
its contract [with Tulane], GIBS would not have continued to

---

[41] GIBS objects to Murphy's summary judgment evidence on the
basis that the evidence was not authenticated.   *See* Document No.
101 at 16-17.   Murphy's supplementary authentication (Document
No. 117) cures the alleged defect, and GIBS's objections are
therefore OVERRULED.

[42] Document No. 24 ¶¶ 3.8, 5.1.

construct the modular units."[43]    Thus, "but for Brian Lash's misrepresentations and material omissions, GIBS would not have continued to construct the modular units or incur the cost and expense to accomplish same."[44]    Lash and Target seek summary judgment dismissing GIBS's claim for fraud by misrepresentation because there is no evidence establishing any of the elements of such a claim.[45]    Further, Lash and Target seek summary judgment on GIBS's claim for fraud by nondisclosure contending (1) Lash owed GIBS no duty to disclose the existence or content of Addendum A, (2) there is no evidence of fraudulent intent, (3) GIBS did not rely on any nondisclosure, and (4) GIBS did not suffer injury as a result of any nondisclosure.    Lash and Target also contend that both of GIBS's fraud claims are barred by the law of con-tort.[46]

---

[43] Id.

[44] Id. ¶ 5.1

[45] Thus, Lash and Target contend that there is no evidence that: (1) Lash made a false material representation, (2) which Lash knew was false or made recklessly without knowledge of the truth at the time it was made, (3) Lash made the representation with the intention that GIBS rely on it, (4) GIBS actually and justifiably relied on the representation, and (5) the misrepresentation resulted in injury to GIBS.    Ernst & Young, L.L.P., 51 S.W.3d at 577; Johnson, 962 S.W.2d at 524.

[46] GIBS objects to the Lash's summary judgment evidence on the basis that the evidence was not authenticated.    *See* Document No. 104 at 5.    Again, this was cured by Defendants' Supplementary Authentication (Document No. 117), and GIBS's objections are therefore OVERRULED.

16

a.   <u>Fraud by Misrepresentation</u>

For this fraud claim, GIBS relies only on the deposition testimony of its lawyer and representative, Smith.  *See* Document No. 104 at 6-7.  Viewed in the light most favorable to GIBS, Smith testified that Lash on or about February 15 told Smith that "Target was negotiating with Tulane to obtain funds which would be given to GIBS as payment under *the Housing Agreements*."  The uncontroverted summary judgment evidence is that Target and Tulane in fact did negotiate to settle a number of issues that had arisen during their contractual relationship, including the termination of the Tulane-Target Faculty Housing Agreement, the complaints Tulane had about the modules delivered by Target, and Tulane's withholding of payments.  Negotiations on their disputes continued during February, March, and to the first part of April.  Moreover, there is uncontroverted summary judgment evidence that Addendum A, one product of the ongoing negotiations between Target and Tulane and signed by Tulane on February 14, successfully obtained Tulane's release to Target of hundreds of thousands of dollars in progress payments, $400,000 of which was remitted directly to GIBS on February 10, the date that Lash had signed Addendum A.  Smith's testimony fails to raise a fact issue that Lash's representation was false or was made with fraudulent intent.  Likewise, there is no evidence that GIBS suffered any injury as a result of Lash's statement in that there is no proof of the Second Amended

17

Complaint's allegation that GIBS continued to construct modular units after the alleged misrepresentation.  In short, GIBS has failed to raise a genuine issue of material fact on several essential elements of its fraud claim based on the alleged misrepresentation by Lash, and Lash and Target are entitled to summary judgment.

### b.   Fraud by Nondisclosure

To sustain a fraud by omission claim, GIBS must prove all the elements of "fraud by affirmative misrepresentation, including fraudulent intent, with the exception that the misrepresentation element can be proven by the nondisclosure or concealment of a material fact in light of a duty to disclose." *See* <u>United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.</u>, 414 F.3d 558, 567 (5th Cir. 2005); *accord* <u>Bradford v. Vento</u>, 48 S.W.3d 749, 754-56 (Tex. 2001).

GIBS's non-disclosure fraud claim is premised on the third sentence of paragraph 1 in Addendum A, italicized below:

> 1.   Under the terms of the Student Housing Letter Agreement, Target is obligated to manufacture, deliver to Tulane, and install on Tulane property, on or before January 11, 2006, forty-four (44) Modules to be used for student housing.  As of the date of this Addendum, Target has delivered twenty-two (22) Modules to the installation site designated by Tulane.  *Tulane has not accepted any of the Modules in their current condition, all of which are non-conforming.*  Tulane, solely in the spirit of cooperation, has agreed, however, to make

18

certain payments for Modules already delivered to
the site, even though it is not obligated to do so.
By making these payments, Tulane does not waive any
of its rights or remedies under the Student Housing
Letter Agreement.[47]

Smith testified by deposition for GIBS that he believed Target's
prospects for payment from Tulane "in my view go way down once your
client admits he's in default."[48]  Smith reiterated this idea in the
concluding questions asked by Target's counsel:

> Q.   Why?  The -- The non-conforming language is
> limited to the first 22 modules for which
> payment's going to be made.  So how does that
> weaken Target's position with respect to
> Tulane?
>
> A.   It – It obligates Target to basically go make
> Tulane happy.
>
> Q.   Okay.  What else besides having to make Tulane
> happy in Addendum A weakens Target's position
> with respect to the other 22 modules under the
> student contract?
>
> A.   I don't know.  I'd have to go back and study
> it.   I haven't read this before today in
> preparation.[49]

Under Texas law it appears that Target, which had never
disclosed to GIBS its contracts with Tulane, had no duty to
disclose to GIBS its Addendum A inasmuch as GIBS and Target had

---

[47] Document No. 86, ex. 7 (Addendum).

[48] Document No. 86, ex. 6 (Smith Depo.) at 338.

[49] Id., ex. 6 (Smith Depo.) at 356-57.

19

dealt with each other at arm's length and had no fiduciary or confidential relationship with each other. *See* <u>Bradford</u>, 48 S.W.3d at 755-56; <u>United Teacher Assocs. Ins. Co.</u>, 414 F.3d at 566 ("A reasonable jurist might well conclude, certainly after <u>Bradford</u>, that a duty to disclose exists in Texas only in the context of a confidential or fiduciary relationship," but going on to discuss some contrary holdings). Regardless, even assuming a duty to disclose, on this summary judgment record there is no evidence sufficient to raise a genuine issue of material fact that Target defrauded GIBS by not disclosing Addendum A and the particular sentence above quoted in which Tulane's position on the first twenty-two Modules is accurately recited and concurred in by Target. Although Smith believed Target's concurrence disadvantaged Target and "obligate[d] Target to basically go make Tulane happy," there is no summary judgment evidence that Target's non-disclosure of that sentence to GIBS was intended to defraud GIBS or that GIBS suffered any injury as a result of the non-disclosure. To the contrary, it was this same undisclosed Addendum A that provided for Tulane to release hundreds of thousands of dollars to Target, $400,000 of which flowed directly to GIBS. Lash and Target are entitled to summary judgment on GIBS's fraud claim.

3.   <u>GIBS's Fraud and Promissory Estoppel Claims Based on Baricev's Alleged Misrepresentation</u>

GIBS's fraud claim against Baricev and Tulane and promissory estoppel claim against Tulane also depend upon the testimony of GIBS's lawyer, Smith, who testified that at the meeting in Houston on January 15 and 16, attended by Baricev and Finnin for Tulane, Winfried Scheel and possibly Murphy for Target, and James Case (GIBS's president), Walton Huff, Farrell Soileau, Rogers Cavasor, Robert Thornton, and Smith for GIBS, that Smith engaged Baricev in a private conversation for five minutes or less, which no one else heard.  Smith testified that he initiated the private conversation when he "went over to him," and said, "Look, if we are going to ship these things, we got to get paid."[50]  Smith did not try in his testimony to "quote [Barisev] because this is approximately two years ago," but stated that the substance of Barisev's statement was, "If you-all can get these buildings built, I will get you paid.  And we -- There was a comment made about, you know, that he was going to be getting Target paid."[51]  When asked whether Smith understood that Barisev was agreeing for Tulane to pay GIBS directly, Smith replied:

A.   No.  That he would get the money turned loose.

---

[50] Document No. 82, ex. 8 (Smith Depo.) at 121.

[51] <u>Id.</u>, ex. 8 (Smith Depo.) at 122-23.

> Q.   Turned loose and that the money would then go
>      to Target.
>
> A.   Yeah.[52]

There is no summary judgment evidence that either Smith or Baricev
reported Baricev's statement to Target's representatives with whom
they were meeting during these two days of negotiations in Houston.
Smith testified that he did not document this conversation with
Barisev in any communication to Target.  Nor is there any summary
judgment evidence of when and exactly what Smith reported about
this conversation to his own client.

Baricev and Tulane seek summary judgment dismissing GIBS's
claims of fraud and promissory estoppel, contending (1) there is no
evidence that GIBS justifiably relied on any statements by Baricev
concerning Target paying GIBS, (2) Baricev's alleged misrepre-
sentation was vague and indefinite, and (3) as to the fraud claim,
there is no evidence that when Baricev made the alleged
representation he did not intend to perform.[53]

Claims for fraud require actual and justifiable reliance on
the alleged representation.  Brittan Commc'ns Int'l Corp. v. Sw.
Bell Tele. Co., 313 F.3d 899, 906 (5th Cir. 2002).  Similarly,
claims for promissory estoppel require "substantial reliance [on
the promise] by the promisee," and such reliance "must be both

---

[52] Id., ex. 8 (Smith Depo.) at 124.

[53] Document No. 82.

reasonable and justified." <u>Pegram v. Honeywell, Inc.</u>, 361 F.3d 272, 288 (5th Cir. 2004) (citing <u>English v. Fischer</u>, 660 S.W.2d 521, 524 (Tex. 1983)); <u>Vlasek v. Wal-Mart Stores, Inc.</u>, Civil Action No. H-07-0386, 2007 WL 2402183, at *6 (S.D. Tex. Aug. 20, 2007) (Rosenthal, J.).   "To determine justifiability, courts inquire whether--given a fraud plaintiff's individual character-istics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud--it is extremely unlikely that there is actual reliance on the plaintiff's part." <u>Haralson v. E.F. Hutton Group, Inc.</u>, 919 F.2d 1014, 1026 (5th Cir. 1990) (citing <u>Lone Star Machinery Corp. v. Frankel</u>, 564 S.W.2d 135, 139 (Tex. App.--Beaumont 1978, no writ); <u>Gen. Motors Corp. v. Courtesy Pontiac, Inc.</u>, 538 S.W.2d 3, 6 (Tex. App.--Tyler 1976, no writ)), *overruled in part by* <u>Gustafson v. Alloyd Co.</u>, 115 S. Ct. 1061 (1995).

In proving justifiable reliance in a claim for fraud or promissory estoppel, the alleged representation relied upon cannot be vague and indefinite.  The Texas Supreme Court put it this way in <u>Montgomery County Hospital District v. Brown</u>:  "'Only when the promises are definite and, thus, of the sort which may be reasonably or justifiably relied on by the employee, will a contract claim be viable, not when the employee relies on only vague assurances that no reasonable person would justifiably rely upon.'"   965 S.W.2d 501, 503 (Tex. 1998) (quoting <u>Hayes v.</u>

_Eateries_, 905 P.2d 778, 783 (Okl. 1995)).  "While the _Brown_ court was only considering the reasonableness of reliance for purposes of a contract claim, other courts have applied similar consideration to [fraud and promissory] estoppel claims."  _Gilmartin v. KVTV-Channel 13_, 985 S.W.2d 553, 558 (Tex. App.--San Antonio 1998, no writ).  Thus, reliance on a promise may establish fraud and promissory estoppel claims only when the promise is not vague or indefinite. _E.g._, _Brakens v. Ennis State Bank_, No. 00-10438, 2001 WL 360647, at *5 & n.12 (5th Cir. Mar. 12, 2001) (affirming summary judgment denying fraud claim where the defendant's agent "made representations that suggested [the plaintiff's] job was not at risk" because the plaintiff "alleged no facts that indicate that [the agent's] comments, whatever they may have been, were more than vague assurances"); _accord_ _Vannoy v. Saks Inc._, 87 F. App'x 349, 353 (5th Cir. 2004) (affirming summary judgment under similar principles of Mississippi law: "Beyond [the defendant's representative's] vague claims that [the plaintiff] would 'end up making more money,' there was no discussion of salary, hours, responsibilities, or starting date . . . . Under the circumstances, [the representative's] alleged promises were simply too vague to support a promissory estoppel claim."); _Herod v. Baptist Found. of Tex._, 89 S.W.3d 689, 694-95 (Tex. App.--Eastland 2002, no pet.) (promise too indefinite and vague to support fraud and promissory estoppel claims: "Herod asked [defendant's representative] what

24

would happen if the [defendant] decided not to pursue a retirement program.  Herod testified that [the representative] replied to his question by stating that, 'if we don't do the retirement program, you'll just continue on as the chief administrative officer and have those responsibilities'"); Gillum v. Rep. Health Group, 778 S.W.2d 558, 570 (Tex. App.--Dallas 1989, no writ) (promises that "[defendant] would have sufficient funding to upgrade the hospital's equipment care; that the hospital would remain primarily a 'D.O.' hospital; that [plaintiff] could continue to make the changes to upgrade the level of health care at the hospital; and that a new hospital facility was to be constructed," too indefinite and vague for promissory estoppel claim).

In this case Smith did not quote any specific statement or representation made to him by Baricev, and could only describe what he termed "the substance" of the statement, namely, that if GIBS "can get these buildings built, I will get you paid," and that "he was going to be getting Target paid."  Smith agreed that no promise was made by Baricev that Tulane would pay GIBS, but only "[t]hat he [Baricev] would get the money turned loose."  This vague, indefinite statement contained no specifics as to the particular conditions upon which the money would be turned loose, the amount of money that would be turned loose, the date(s) upon which money would be turned loose, how or under what authority Baricev could "get [GIBS] paid" by a third party [Target], what portion of the

25

money turned loose to Target might be paid in turn by Target to GIBS, which and how many particular buildings were to be built, the standards to which they were now to be built, the terms of their delivery, etc.  As a matter of law, no person in the context of a multi-million dollar construction contract dispute could reasonably or justifiably change its position to its own detriment in reliance on such a vague and indefinite statement as the one attributed to Baricev.  This vague and indefinite statement as a matter of law provides no foundation for a claim of fraud or promissory estoppel.

Further, Baricev allegedly made his vague response only to Smith, when Smith went "over to him" for a private conversation concluded within five minutes or less.  The evidence is that Smith is a lawyer of 20 years' experience, who concentrates his practice in construction litigation.   With that background, Smith was representing GIBS in three-party negotiations over a period of two days in Houston, in which GIBS, Target, and Tulane were all represented.  GIBS and Tulane had no contract between them.  Tulane had contracted with Target, and Target contracted with GIBS as its subcontractor.  GIBS has offered no summary judgment evidence that Tulane had power or authority to compel Target to pay anything to GIBS when it "turned loose" money to Target.  *See* Brittan Commc'ns Int'l Corp., 313 F.3d at 906-07 (5th Cir. 2002) (affirming summary judgment and finding no justifiable reliance where "[a]ny alleged misrepresentation by [the defendant] regarding the length of time

26

it would take to restore billing services was essentially meaningless given that the decision of when, and if, to resume rested with [a third party].")․ Viewed in a light most favorable to Plaintiff and in the context of the uncontroverted summary judgment evidence surrounding the vague and indefinite statement made by Baricev to Smith, including its implication of Target--a third party over which Baricev and Tulane are not shown to have had control--Plaintiff has failed to raise a genuine issue of material fact that there was justifiable reliance by Smith, and hence by his client GIBS, on Baricev's statement.   Baricev and Tulane are entitled to summary judgment dismissing GIBS's fraud and promissory estoppel claims.

B.   <u>GIBS's Claims for Consequential Damages Against Target</u>

Target moves for summary judgment to deny GIBS's claims for consequential damages arising from Target's alleged breach of the GIBS-Target Housing Agreements.[54]   Specifically, Target contends that GIBS cannot recover (1) future lost profits derived from GIBS's anticipated future contracts with third parties, (2) start-up costs incurred by GIBS, or (3) damages suffered by GIBS from

---

[54] Document No. 88 at 10-31; Document No. 24 at 8 (requesting "consequential damages arising from Defendants' breaches of contract").

27

vendor lawsuits.  Because the GIBS-Target Housing Agreements are
for the sale of movable goods, they are governed by the UCC.[55]

"The [Texas UCC] does not provide for the recovery of
consequential damages by a seller."  Nobs Chem., U.S.A., Inc.
v. Koppers Co., Inc., 616 F.2d 212, 216 (5th Cir. 1980).[56]
Consequential damages are those "which do not arise within the
scope of the immediate buyer-seller transaction, but rather stem
from losses incurred by the nonbreaching party in its dealings,

---

[55] See, e.g., Nobility Homes of Tex., Inc. v. Shivers, 557
S.W.2d 77, 80-83 (Tex. 1977) (allowing a buyer to recover for
defects in a mobile home under the implied warranties provisions of
the UCC); Morgan Bldgs. & Spas, Inc. v. Humane Soc'y of Se. Tex.,
249 S.W.3d 480, 487 (Tex. App.--Beaumont 2008, no pet. h.) ("The
agreement here [for the purchase, manufacture, delivery, and
erection of a custom built steel frame building] is a contract for
the sale of goods and is governed by article 2 of the Uniform
Commercial Code as codified in chapter 2 of the Texas Business and
Commerce Code.  Chapter 2 broadly defines "goods" to mean things
that are moveable at the time of identification to the contract for
sale." (citation omitted)); Bowen v. Young, 507 S.W.2d 600, 601-05
(Tex. App.--El Paso 1974, no writ) (applying the UCC's warranty
provisions to a dispute involving mobile homes).

[56] See also Tenn. Gas Pipe. Co. v. Lenape Res. Corp., 870
S.W.2d 286, 302 (Tex. App.--San Antonio 1993) ("The UCC
specifically provides that an aggrieved buyer may recover
incidental and consequential damages.  There is no provision,
however, for an aggrieved seller to recover consequential damages.
(emphasis in original)), aff'd in part and rev'd in part on other
grounds, 925 S.W.2d 565 (Tex. 1996); USX Corp. v. Union Pac. Res.
Co., 753 S.W.2d 845, 855-56 (Tex. App.--Fort Worth 1988, no writ)
("At best, the benzene expense was a consequential damage, a
category of damages not available to sellers under the Uniform
Commercial Code."); 14 WILLIAM V. DORSANEO III, TEXAS LITIGATION GUIDE
§ 210.30[1][c] (2008) ("[A] seller may not recover consequential
damages from a breaching buyer."); 65 TEX. JUR. 3D SALES § 361
("Chapter 2 of the [UCC] does not provide for recovery by a seller
of consequential damages; consequently, such damages are not
available to sellers under Chapter 2." (footnotes omitted)).

often with third parties which were an approximate result of the breach." USX Corp. v. Union Pac. Res. Co., 753 S.W.2d 845, 855-56 & n.5 (Tex. App.--Fort Worth 1988, no writ).  GIBS's damages for lost future profits, startup costs, and vendor lawsuits would constitute consequential damages as defined by Texas law--a conclusion GIBS tacitly recognizes by not disputing the damages' characterization as consequential. *See* id.  These consequential damages are not recoverable by GIBS, the seller.[57]  Accordingly, Target's request for summary judgment on GIBS's claims for consequential damages arising out of Target's alleged breach of contract is granted.

C.   The Remaining Requests for Summary Judgment

Genuine issues of material fact and/or controlling law preclude all other requests for summary judgment. Celotex, 106 S. Ct. at 2552-53.

IV.  Order

Accordingly, it is

ORDERED that Joseph H. Murphy and Target Logistics, LLC's Motion for Summary Judgment (Document No. 87), Brian S. Lash and

---

[57] Moreover, GIBS has failed to raise a genuine issue of fact establishing the amount or validity of any of these alleged damages.

Target Logistics, LLC's Motion for Summary Judgment (Document No. 86), and Peter Baricev and The Administrators of the Tulane Educational Fund's Motion for Partial Summary Judgment (Document No. 82) are GRANTED, Plaintiff's fraud and promissory estoppel claims against those parties are DISMISSED, and because Plaintiff has no other claims against Tulane and Baricev, Plaintiff shall take nothing against Tulane and Baricev and Plaintiff GIBS's case against those two parties is DISMISSED on the merits.   It is further

ORDERED that Target Logistics, LLC's Motion for Summary Judgment on Plaintiff Global Integrated Building Systems' Breach of Contract Damages Claim (Document No. 88) is GRANTED with respect to Plaintiff's claims for lost future profits, start-up cost, and vendor lawsuit damages, and those claims are DISMISSED.   Target's motion is otherwise DENIED.   It is further

ORDERED that Global Integrated Building Systems' Motion for Partial Summary Judgment (Document No. 91), and Target Logistics, LLC's Motion for Summary Judgment on The Administrators of the Tulane Educational Fund's Breach of Faculty Agreement Claim (Document No. 90) are DENIED.

Remaining for trial are Global Integrated Building Systems' ("GIBS") breach of contract claim against Target, Target's counterclaim for breach of contract against GIBS, Target's breach

of contract claim against Tulane, and Tulane's counterclaim for breach of contract against Target.

The Clerk shall notify all parties and provide them with a signed copy of this Order.

SIGNED at Houston, Texas, on this 3rd day of February, 2009.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

31